IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EDGAR ODOM, JR.,
     Plaintiff,

vs.                               Case No. 3:04cv269/MCR/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

**REPORT AND RECOMMENDATION**

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act.

I.     PROCEDURAL HISTORY

     Plaintiff submitted a claim for SSI payments on September 23, 1999, alleging an onset of disability of May 12, 1997 (Tr. 147-49).[1]  The claim was denied initially and upon reconsideration (Tr. 54-56, 78-79).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 85), which was held on September 12, 2001 (Tr. 37-53).  On September 25, 2001, ALJ William Newkirk issued a decision finding Mr. Odom disabled (Tr. 61-64).  The Appeals Council reviewed

_____

[1]All references to "Tr." refer to the Transcript of Social Security Administration Record filed on October 27, 2004 (Doc. 5).

the decision on its own motion due to evidence that Plaintiff had attempted work after his alleged onset date (*see* Tr. 94-98).  The Appeals Council vacated the ALJ's decision and remanded it for further proceedings and another decision to consider whether, in light of the new evidence of a work attempt, that the finding of disabled was supported (Tr. 99-104).  Included in the remand were a specific set of remand orders (*id.*).  On July 8, 2002, a new hearing was held before a different ALJ, Robert Erwin (Tr. 584-623).  On March 25, 2003, ALJ Erwin issued a decision finding that Mr. Odom was not disabled (Tr. 68-73).  His decision, however,  failed to follow the remand orders set forth by the Appeals Council in its remand from the original favorable decision, and Mr. Odom filed a request for review of the hearing decision.  The Appeals Council granted his request for review under the "substantial evidence" provision of 20 C.F.R. § 416.1470(a)(3).  On July 3, 2003, the Appeals Council vacated the hearing decision and again remanded the case to a third ALJ for further proceedings and a new decision (Tr. 129-31).  On January 26, 2004, a third hearing was held before ALJ Alan E. Michel, at which Plaintiff was represented by counsel and testified (Tr. 550-83).  On April 12, 2004, ALJ Michel issued a decision finding Mr. Odom not disabled (Tr. 23-35).  The Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 7-9).  The Appeals Council's action made the ALJ's decision the final decision of the Commissioner, and therefore subject to review in this court.  <u>Falge v. Apfel</u>, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.     FINDINGS OF THE ALJ

ALJ Michel found that: 1) Mr. Odom had not engaged in substantial gainful activity since he protectively filed his application for SSI on September 23, 1999 (Tr. 24, 34);  2) medical evidence established that Mr. Odom suffered from severe impairments including a small left paracentral disc herniation at L-5-S1, mild osteoarthritis of the spine, a history of asthma, and an affective disorder, but did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 to Subpart P of Regulations No. 4 (Tr. 25, 34);  3) Mr. Odom could not return to his past relevant work as a taxi driver, but retained the residual functional capacity ("RFC") to perform unskilled sedentary work (*id.*);  4) Mr. Odom's testimony regarding subjective complaints and functional limitations was not supported by the evidence as a whole, or to the disabling degree alleged, and therefore lacked credibility (Tr. 34); and 5) based upon

testimony of a Vocational Expert ("VE"), there were jobs available in significant numbers in the national economy that Mr. Odom could perform considering his age, education, vocational profile, and RFC, including parking attendant (unskilled, light-exertion), arcade attendant (unskilled, light-exertion), and surveillance system monitor (unskilled, sedentary-exertion) (*id.*).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.   If the claimant is performing substantial gainful activity, he is not disabled.

2.   If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.   If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.   Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.   Personal and Employment History

Edgar Odom, Jr. was born on October 25, 1954 (Tr. 147). He was 44 years old, a "younger individual" (see 20 C.F.R. § 416.963(c)) when he applied for benefits in 1999. Plaintiff claimed an

inability to work because of severe back injuries and resultant pain, and an inability to drive due to the side effects of his medication (Tr. 175).  Though Plaintiff testified that he completed the 7th grade, the ALJ found that he had a 6th grade or "marginal" education (Tr. 25, 558).  Plaintiff had past relevant work experience as a taxi driver and worked as such from 1973 until 1998 (Tr. 204, 559).

Plaintiff testified at his third hearing on January 26, 2004, as follows:  He completed the 7th grade and can read and write "a little, very little" (Tr. 559).  He thinks he took an oral driver's test to receive his taxi driver's license (*id.*).  He lives alone (Tr. 561).  His weighs 275 pounds, which is about 50 pounds over his normal weight (Tr. 562).  His list of medications was correct and up to date *(see* Tr. 252, listing Skelaxin (a muscle relaxer), Naproxen (pain medication), Clarinex (sinus medication), and Albuterol (for shortness of breath)), but Plaintiff has not been taking his medications since May 2003 because Medicaid will no longer pay for them (Tr. 562).  Plaintiff wrote his own list of medications, and in so doing, was able to copy the names off the prescription bottles and record them on the medication list (Tr. 563).  Plaintiff never served in the military (*id.*).  He receives food stamps in the amount of $138.00 per month (Tr. 564).  He was involved in a car accident in May 1997 and received no money from a lawsuit because the other driver was uninsured and Plaintiff did not have uninsured motorist coverage (Tr. 564-65).  Plaintiff has not worked since the accident and cannot lift because of a back injury (Tr. 566).  His former job as a taxi driver required him to lift heavy luggage, as he mainly worked at the airport (*id.*).  Plaintiff testified that he believed he could not find other work because of his limited education and inability to lift, bend, stoop, etc.; therefore, Plaintiff made no attempt to find other work (Tr. 567).  He testified he was able to attend to personal grooming, such as bathing and dressing (*id.*).  He makes his bed, but like any other activity, he does so at a much slower pace (Tr. 568).  He can drive for one hour at a time and still possesses a class D commercial drivers license (Tr. 568-69).  He does laundry, grocery shops, and cooks food in a microwave (Tr. 569).  He watches a lot of television, and basically just sits around talking on the phone (*id.*).  Plaintiff testified that he tries to read, and can do so a little, but he does not remember what he reads and does not understand many of the words (Tr. 570).  Plaintiff uses a cane, especially when it rains, and experiences pain in his right leg and knee, in addition to back pain (Tr. 571).  He can sit in a car for approximately one hour, but then needs to

stretch and move around (*id.*).  His ability to stand is also limited, but laying down helps alleviate his pain (*id.*).

      B.      Relevant Medical History

      Plaintiff was injured in a motor vehicle accident ("MVA") on or about May 7, 1997, and sought treatment at the West Florida Regional Medical Center emergency room a week later, on May 14, 1997 (Tr. 263).  He complained of neck and low back pain, but moved "of his own volition" and had done so for the last week (*id.*).  X-rays were taken of his cervical and lumbosacral spine and were negative (*id.*).  Specifically, the lumbar vertebrae were found to be "generally normal in contour, density and alignment.  No fracture or destructive lesions [were] seen" and "no acute bony abnormality in the lumbar spine" was present (Tr. 265).  Thus, Plaintiff was discharged "in good condition" with an expected resolution within one week (Tr. 263-64).  It was estimated that Plaintiff could return to work on May 18, 1997 (Tr. 267).

      Following the accident, Plaintiff sought treatment at Roberts Chiropractic Center (Thomas A. Roberts, D.C.) from June 27, 1997 to December 10, 1997; February 23, 1999 to April 19, 1999; April 5, 2000 to April 19, 2000; and again from October 30, 2001 to August 27, 2003 (*see* Tr. 269-341; 398-410, 469-96).  At Plaintiff's initial visit in June 1997, he reported that his neck and low back pain were "mild to severe" and that his pain "comes and goes" (Tr. 335).  He indicated that his pain was aggravated by sitting or standing too long, or by turning his head, but the pain was relieved with medication (*id.*).  Throughout the course of his treatment, Plaintiff generally reported pain and stiffness in his lower back, neck pain, muscle spasms, headaches and occasional shoulder pain, which were treated with chiropractic manipulations and/or physical therapy (*see, e.g.*, Tr. 328, 330-31).  Plaintiff often felt better or much better after the treatments (*see, e.g.*, Tr. 294, 301, 313, 331).  In July 1997, Dr. Roberts noted that Plaintiff was progressing and responding favorably to treatment (Tr. 327).  Dr. Roberts concluded that Plaintiff reached maximum medical improvement ("MMI") as of November 21, 1997 (Tr. 284).  A week later, however, Plaintiff returned complaining of an exacerbation of his symptoms (Tr. 283).  Plaintiff was treated and his symptoms were "reduced back to the point they were at [MMI]" (*id.*).  The file contains no records from 1998.  On February 23, 1999, Plaintiff returned to Dr. Roberts complaining of constant, moderate to severe low back pain and "off and on" moderate neck pain (Tr. 279).  Plaintiff claimed that any kind of movement hurt

(*id.*).  An x-ray was taken which revealed "multiple subluxations in the lumbosacral spine with some degenerative discs at L4/L5, L5/S1" (Tr. 277).  Plaintiff was again treated with chiropractic manipulations.  On April 6, 1999, Dr. Roberts noted that Plaintiff was "progressing well" and should be at MMI after two more treatments (Tr. 270).  In April 2000, Plaintiff returned to Dr. Roberts and reported severe, constant, low back pain and "off and on" moderate neck pain (Tr. 402).  He claimed he could not do "much of anything" (*id.*).  Plaintiff was again treated with chiropractic manipulations (*see* Tr. 398), but on April 24, 2000, Dr. Roberts noted that Plaintiff's symptoms had exacerbated and opined that, due to Plaintiff's neuromuscular skeletal condition, he was "100% totally disabled from his present employment" (Tr. 401).  In October 2001, Plaintiff returned again to Dr. Roberts, this time describing his neck and back pain as "moderate to severe" and constant (Tr. 491).  Plaintiff was again treated with chiropractic manipulations through August 2003 (Tr. 469, 471, 473, 475-85, 487-90).  In June 2003, Dr. Roberts again concluded that Plaintiff was "100% totally disabled from his present employment" (Tr. 472), and in July 2003, Dr. Roberts found Plaintiff to be "100% permanently totally disabled" (Tr. 470).

Plaintiff saw H. David Brannon, M.D., on June 26, 1997[2] following his MVA.  At that time, Dr. Brannon noted that Plaintiff failed to follow all instructions given at his last visit (notes from that visit are not in the file), including advice to take Skelaxin and to participate in physical therapy (Tr. 351).  Dr. Brannon reviewed Plaintiff's x-ray report which showed a normal cervical and lumbosacral spine.  Plaintiff was diagnosed with muscle spasm and whiplash (*id.*).  On June 15, 1998, Dr. Brannon referred Plaintiff for an MRI which revealed a small, left paracentral disc herniation at L5-S1 (Tr. 411).  Plaintiff saw Dr. Brannon again from July 22, 1998 to August 5, 1999, for complaints including high blood pressure, sinus problems, pink eye, a cough, and depression (*see* Tr. 343-48).  Plaintiff was advised to stop smoking and to lose weight (Tr. 346-47).  Dr. Brannon became frustrated with Plaintiff because Plaintiff continually disregarded his advice, including his recommendations that Plaintiff see a neurosurgeon regarding his back and seek a second opinion from a pain specialist (Tr. 344).  Plaintiff wanted Dr. Brannon to write a letter stating

---

[2]The treatment notes reflect an office visit on June 26, 1996, but because the visit was for "follow-up of MVA" (*see* Tr. 351), this court presumes that the visit followed Plaintiff's May 1997 car accident, as there is no evidence of any other accident in the file (*see also* Tr. 353, reflecting an office visit with Dr. Brannon on June 26, 1997).

that he was disabled, but Dr. Brannon refused to do so, stating "I do not think he is disabled and he cannot have more narcotics.  He refuses surgery, refuses epidural injections and prefers to seek a disabled path in his life" (Tr. 343-44).

Plaintiff also saw Dr. Earl J. Crosswright, who referred Plaintiff for a lumbar spine x-ray on April 5, 2000.  The x-ray revealed an "unremarkable lumbar spine" (Tr. 468).

Plaintiff was periodically treated by Mariano Pacheco, M.D., between December 20, 2001 and August 25, 2003 (*see* Tr. 431-66; 500-38).  Generally, Plaintiff complained of low back pain and muscle spasm.   Dr. Pacheco instituted a conservative treatment regime, including a recommendation for weight loss, a healthier lifestyle, smoking cessation, and exercise (*see, e.g.*, Tr. 451, 457, 465).  Plaintiff also complained of asthma on several visits (*see, e.g.*, Tr. 452) and was prescribed an inhaler (Tr. 451).  Overall, Dr. Pacheco concluded that Plaintiff suffered from multiple chronic problems, including asthma, allergic rhinitis, low back pain, depression, and hypercholesterolemia, but these conditions were noted to be "clinically stable" (Tr. 437).

C.      Other Information within Plaintiff's Claims File

A consultative physical examination was conducted by Richard W. Lucey, M.D., on November 9, 1999 (*see* Tr. 354-58).  Plaintiff stated he was in a MVA in May 1997 and had been bothered with back pain since that time (Tr. 354).  He told Dr. Lucey that x-rays of his back and neck were normal, but that Dr. Brannon told him an MRI revealed a herniated disc in his lower back (*id.*).  Plaintiff also discussed his chiropractic treatments, but claimed they had not helped much with the pain (*id.*).  Plaintiff advised that his pain is aggravated by bending, stooping and heavy lifting (*id.*).   Additionally, Plaintiff stated that he suffered from stress and that his blood pressure was elevated due to stress and depression.  However, he stated he was prescribed Paxil, which controlled the stress, depression, and blood pressure (Tr. 355).  Dr. Lucey's physical examination revealed, in part, the following:

> UPPER EXTREMITIES:   Grip strength 5/5.   Normal fine manipulatory movements.  Full range of movement [ROM] of all major joints.   No weakness, atrophy, sensory deficits or joint deformities.  Normal DTR's.
> LOWER EXTREMITIES: No edema or varicosities.   Peripheral circulation intact.  Normal DTR's.  Negative SLR's to 60° supine.

> Full [ROM] of all major joints.  No effusion, crepitus, laxity or joint
> deformities.
> BACK: Posture is erect.  Gait is normal.  Heel, toe and Tandem
> walking without evidence of weakness or ataxia.  Transfers without
> subjective discomfort from supine to sitting to standing. [ROM] of
> thoracolumbar spine is mildly decreased.

(*id.*).

On November 30, 1999, Plaintiff was seen by consulting psychologist Charles A. Thomas, Jr., Ph.D. (*see* Tr. 360-62).  Dr. Thomas diagnosed Plaintiff with pain disorder with associated psychological factors and a general medical condition (Tr. 362).  He noted that Plaintiff probably had intelligence within the borderline to low-average range (Tr. 361).  Dr. Thomas found no significant evidence of memory loss or clinically significant depression, and opined that Plaintiff was cognitively capable of doing appropriate work and could manage his own funds (*id.*).

A *Physical Residual Functional Capacity Assessment* form was completed by a DDS physician (name unknown) on December 10, 1999 (*see* Tr. 364-71).  The doctor concluded that Plaintiff: could occasionally[3] lift and/or carry (including upward pulling) 20 pounds; frequently[4] lift and/or carry (including upward pulling) 10 pounds; stand, walk or sit (with normal breaks) for about six hours in an eight-hour workday; had the unlimited ability, subject to the above restrictions, to push and/or pull (including operation of hand and/or foot controls); and had occasional postural limitations (i.e., in his ability to climb, balance, stoop, kneel, crouch or crawl), but no manipulative limitations (to reach, handle, finger or feel), nor any visual, communicative or environmental limitations (Tr. 366-68).  A second physical RFC form was completed on April 25, 2000 (*see* Tr. 381-88). The only conclusions different from those reached on the first, were that Plaintiff had frequent postural limitations in climbing ramps or stairs, and that Plaintiff could never climb ladders, ropes or scaffolds (Tr. 383).

A *Psychiatric Review Technique* ("PRT") form was completed on December 14, 1999, by a reviewing physician (*see* Tr. 372-80).  Plaintiff's psychiatric condition was evaluated under

---

[3]"Occasionally" means occurring from very little up to 1/3rd of an 8-hour workday (cumulative, not continuous).

[4]"Frequently" means occurring 1/3rd to 2/3rds of an an 8-hour workday (cumulative, not continuous).

Section 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Affective Disorders*) (Tr. 372, 375), as no evidence of any other disorder existed (*see* Tr. 374-78).  The physician concluded that Plaintiff "appears to have a mild mood disorder due to his physical condition and pain, but his mental condition is not severe" and does not satisfy the diagnostic criteria necessary to qualify as disabled under section 12.04 (Tr. 372, 373, 375).  The reviewer noted Plaintiff's long history of successful employment, the lack of significant evidence of clinical depression, and a mental status within normal limits (Tr. 373).  As a result of Plaintiff's mood disorder, the reviewer opined that Plaintiff would have slight restriction of activities of daily living; no difficulties in maintaining social functioning; "seldom" deficiencies of concentration, persistence or pace, resulting in a failure to timely complete tasks; and no episodes of deterioration or decompensation (Tr. 379).  A second PRT form was completed in May 2000 (*see* Tr. 389-97), and Plaintiff's condition was again evaluated under section 12.04 (Tr. 389, 392).  The reviewer found that Plaintiff suffered from adjustment reaction disorder with mixed emotional features, but that this impairment was not severe (*id.*).  The reviewer noted Plaintiff's work history; the fact that Plaintiff had never sought, received or been referred for any psychiatric treatment; and that Plaintiff had never been diagnosed with any psychiatric disorder other than "mild adjustment reaction" (Tr. 390).  He found no restriction of activities of daily living; no difficulties in maintaining social functioning; "seldom" deficiencies of concentration, persistence or pace, resulting in a failure to timely complete tasks; and no episodes of deterioration or decompensation (Tr. 396).

On October 1, 2002, Plaintiff was seen by Richard E. Doll, Ph.D., on a consultative basis (*see* Tr. 426-28).  Dr. Doll noted that Plaintiff's long term memory for critical details was good and that his language style was coherent and understandable, although the style suggested below average intelligence (Tr. 426-27).  Dr. Doll performed an I.Q. test which yielded the following results: verbal I.Q. 65, performance I.Q. 69, and full scale I.Q. 64 (Tr. 427).  He diagnosed Plaintiff with mild mental retardation (Tr. 428), but found that Plaintiff's ability to tolerate the mental demands of a work setting, without deterioration or decompensation, was fair (Tr. 427).  Further, he opined that Plaintiff had only slight deficiencies in the ability to understand, remember, and carry out short simple instructions or make judgements on simple work-related decisions (Tr. 429).  Plaintiff had

moderate limitations in working with detailed instructions (*id.*), but no limitations in the ability to respond appropriately to supervisors, co-workers, or work pressures (Tr. 430).

On October 11, 2002, Plaintiff was seen by Roy R. Reyes, M.D., for a consultative physical examination (*see* Tr. 412-15). Plaintiff had full strength and normal ranges of motion in both arms (Tr. 413), but strength in his lower legs was 3/5 (Tr. 414). He had an abnormal range of motion, as well as pain and tenderness, in his lumbar spine, hips and knees (*id.*). An examination of Plaintiff's spine revealed the presence of paravertebral muscle spasms (*id.*). Seated and supine straight leg testing was positive, but Plaintiff experienced pain at 25 degrees (*id.*). Additionally, Plaintiff could bend forward and touch his knees, but doing so was painful (*id.*). Dr. Reyes concluded that Plaintiff suffered from anxiety and depression, as well as controlled hypertension (Tr. 415). He thought Plaintiff could occasionally lift or carry ten pounds (Tr. 417); sit for a total of four hours in a workday, in one hour increments; stand or walk two hours in a workday, in less than one hour increments; grasp; manipulate; occasionally use his right foot; and frequently use his left foot (Tr. 418). Plaintiff could occasionally balance or stoop, but could never climb, crouch, kneel or crawl (Tr. 419). Further, Dr. Reyes opined that Plaintiff could continuously handle, feel, hear and speak; frequently reach; but never push or pull (*id.*). Plaintiff should never be around heights, moving machinery or dust, and should avoid moderate exposure to humidity and extreme temperatures, although Plaintiff had no restrictions regarding exposure to vibrations, noise or chemicals (Tr. 420).

Finally, on November 3, 2003, Plaintiff was referred to orthopedic surgeon C.W. Koulisis, M.D., for an orthopedic consultative examination (*see* Tr. 539-47). Prior to examining Plaintiff, Dr. Koulisis reviewed Plaintiff's relevant medical records, including the MRI taken on June 15, 1998 (which reflected a "small left paracentral disc herniation [at] L5-S"1 (*see* Tr. 411)) and x-rays of Plaintiff's cervical and lumbar spine (Tr. 539, 541). Plaintiff complained of pain in his neck, low back and right leg (Tr. 539), but Dr. Koulisis found him to be "neurologically intact" (Tr. 541). He found that Plaintiff had no impairment that would affect his ability to lift, carry, sit, walk, or use his hands and feet. He found that Plaintiff could "continuously" perform postural activities (such as climbing, stooping, crawling, etc.) and physical functions (such as reaching, pushing, pulling, etc.), and had no environmental restrictions (Tr. 543-46).

V.    DISCUSSION

Plaintiff claims the Commissioner erred: 1) in failing to consider whether Plaintiff's mental retardation was medically equivalent to Listing 12.05, and in failing to find that Plaintiff's mental retardation was a severe impairment; 2) in failing to properly apply the 11th Circuit Pain Standard and in evaluating Plaintiff's credibility; 3) in failing to adequately develop the record and follow the Appeals Council's instructions to contact examining medical sources and obtain evidence from medical expert(s) to clarify the nature and severity of Plaintiff's impairments and the resultant work-related functional limitations; and 4) in failing to sustain her burden of establishing that other work is available in the national economy that Plaintiff can perform.  Thus, Plaintiff asserts that this matter should be reversed with instructions to award benefits, and further, that a remand would serve no useful purpose.  In response, Defendant states that the decision of the Commissioner is supported by substantial evidence on the record as a whole and that reversal for an award of benefits is unwarranted.  If the Court were to conclude that the Commissioner's decision is not supported by substantial evidence, Defendant maintains that a remand is the appropriate measure, not a reversal.

A.    Plaintiff's Mental Retardation.

Plaintiff argues that his mental condition should have been evaluated under Section 12.05 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Mental Retardation and Autism*) and that under that section, his I.Q. score(s), considered in conjunction with his physical impairments, compel a finding of disability (*see* Doc. 7 at 8).

The listings for mental disorders are arranged in nine diagnostic categories, including mental retardation, which is section (or "listing") 12.05.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D). If a claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, the impairment "meets the listing." Plaintiff claims that he satisfies the diagnostic description,[5] and the criteria contained in paragraph C; namely, that he has a valid verbal, performance, or full scale I.Q. between 60 and 70, and a

---

[5]"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initilaly manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" (introductory paragraph, section 12.05).

physical impairment which imposes additional and significant work-related limitations. Unlike paragraphs A and B, which contain criteria that describe disorders considered severe enough to prevent any gainful activity, without any additional assessment of functional limitations, paragraph C requires an assessment of the degree of functional limitation the additional impairment(s) imposes to determine whether it significantly limits physical or mental ability to do basic work activities (i.e., is a "severe" impairment(s), as defined in § 416.920(c)). If the additional impairment(s) does not cause limitations that are "severe" as defined in § 416.920(c), the additional impairment(s) cannot be found to impose "an additional and significant work-related limitation of function," even if a claimant is unable to do past work because of the unique features of that work.

Plaintiff's argument is unpersuasive. First, although Dr. Doll performed an I.Q. test which yielded results in the 60 to 70 range, the ALJ is not required to accept any I.Q. score which appears in the record. *See* Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (ALJ could properly disregard standardized IQ test scores which were inconsistent with the record). Here, the ALJ properly noted that the I.Q. scores were not consistent with the record, including Plaintiff's work history (Tr. 30). The ALJ also noted that Dr. Doll did not detect any serious deficiencies in concentration or persistence, that Plaintiff could follow simple one or two-step instructions, and that Plaintiff's overall ability to do work related mental activities was "fair" (*id.*). Although Dr. Doll's test scores at the time of this one test would indicate retardation, the Eleventh Circuit "has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Popp v. Heckler, 779 F.2d 1497 (11th Cir. 1986); Sellers v. Barnhart, 246 F.Supp.2d 1201, 1206 (M.D. Al. 2002). The ALJ properly found that Plaintiff's alleged "mental retardation" was not a severe impairment, and thus was not required to analyze whether the impairment met listing 12.05. The I.Q. score was inconsistent with the lack of prior diagnosis and treatment, as well as Plaintiff's work history and ability to live independently and perform activities of daily living without assistance.

Second, even if Dr. Doll's I.Q. scores were accepted by the ALJ, the record contains no support for a finding that Plaintiff's mental and/or physical impairments significantly limit his ability to do basic work activities, as required to satisfy the criteria contained in paragraph C. In fact, the

record is replete with information suggesting otherwise.  For example, even Dr. Doll, who diagnosed Plaintiff with mild mental retardation, opined that Plaintiff had only slight deficiencies in the ability to understand, remember, and carry out short simple instructions, and make judgements on simple work-related decisions; moderate limitations in working with detailed instructions; and no limitations in the ability to respond appropriately to supervisors, co-workers, or work pressures (Tr. 429-30).[6]  Dr. Thomas, a consulting psychologist, found Plaintiff cognitively capable of doing appropriate work and managing his own funds (Tr. 361).  Additionally, consulting physicians who evaluated Plaintiff's mental condition noted Plaintiff's long work history as a taxi driver and absence of any history of psychiatric referral or treatment.  They found only slight to moderate restriction of activities of daily living and "seldom" deficiencies of concentration, persistence or pace, and no episodes of deterioration or decompensation.

Accordingly, the ALJ did not err in failing to find that Plaintiff's mental retardation was a severe impairment or that it compelled a finding of "disabled."

B.      The 11th Circuit Pain Standard and Evaluation of Plaintiff's credibility.

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v.

---

[6]Dr. Doll's diagnosis is seemingly inconsistent with the his own statements concerning Plaintiff's ability to work at basic jobs with only "slight" difficulty (Tr. 429).

Railroad Retirement Bd., 935 F.2d 230, 233 (11ᵗʰ Cir. 1991); Landry v. Heckler, 782 F.2d 1551, 1553 (11ᵗʰ Cir. 1986).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11ᵗʰ Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11ᵗʰ Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11ᵗʰ Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, ... the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11ᵗʰ Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11ᵗʰ Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5ᵗʰ Cir.

1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[7]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Here, the ALJ's consideration of Plaintiff's complaints was consistent with the Commissioner's regulations at 20 C.F.R. § 416.929 (2004), and the framework set forth in Hand. Although the ALJ found that "the objectively demonstrable evidence of record fails to support that the claimant is as impaired as he has alleged" (Tr. 29), the ALJ properly articulated his reasons for rejecting Plaintiff's complaints.  First, the ALJ noted that the objective evidence did not support Plaintiff's allegations (Tr. 29).  Indeed, as noted by the ALJ, an MRI during the relevant period showed only a "small" disc herniation (Tr. 29, 411) (which apparently did not cause great concern to Plaintiff's treating physician, Dr. Pacheco, whose extensive reports show at worst only some "tenderness" in the spine (Tr. 431-66, 500-38)), and x-rays in 1999 revealed only moderate osteoarthritic changes in the lower lumbar and upper sacral spine (Tr. 29, 359).   Additionally, although not noted by the ALJ, a lumbar spine x-ray taken in April 2000 was "unremarkable" (Tr. 468).

Second, the ALJ properly evaluated the opinions of Plaintiff's physicians, including chiropractic, treating, and consulting doctors. (Tr. 26-31).  Although Plaintiff received chiropractic

---

[7]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

care from Dr. Roberts, the ALJ did not give significant weight to his opinion that  Plaintiff was "100% disabled."  The ALJ properly noted that a chiropractor is not an acceptable treating source under the regulations (Tr. 29), and Eleventh Circuit case law supports the ALJ's finding.  *See* Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004) (a chiropractor is not considered an"acceptable [medical] source" and thus, a chiropractor's opinion cannot establish the existence of an impairment) (citing 20 C.F.R. § 404.1513(a) and 20 C.F.R. § 416.913(a)); Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998) (an ALJ is permitted to accord less weight to chiropractors and other nonmedical doctors than to medical doctors.).  Regardless, an opinion that an individual is "disabled" is not dispositive.  Whether a claimant meets the statutory requirements for disability is a decision reserved to the Commissioner.  *See* SSR 96-5p.  Additionally, Dr. Roberts' own treatment notes are inconsistent with his finding of "disabled," as that term has been interpreted by the Eleventh Circuit.  As previously noted, Plaintiff often felt better or much better after his chiropractic manipulations.  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v.Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).

The ALJ correctly noted that Plaintiff's treating physician, Dr. Brannon, would not prescribe any more narcotic medications and did not think Plaintiff was disabled (Tr. 29, 343-44).[8]  The ALJ properly gave significant weight to Dr. Brannon's opinion that Plaintiff apparently did not need pain medication and was not disabled, as substantial weight *must* be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527 (d).  Additionally, as noted by the ALJ, Dr. Brannon's records show that Plaintiff "refuses to see a neurosurgeon" or seek a second opinion from a pain specialist (Tr. 29, 344), suggesting that Plaintiff's pain was not significant.  A claimant's failure to seek treatment is a proper factor for the ALJ to consider.  *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984).

---

[8]Plaintiff appears to have stopped seeing Dr. Brannon after he concluded that Plaintiff was not disabled and refused to provide a letter stating otherwise (Tr. 344-45).

Finally, the ALJ considered the results of the consultative physical examinations conducted by Dr. Koulisis and Dr. Lucey, which also support the ALJ's credibility finding (Tr. 27-28, 30). Upon referral to Dr. Koulisis (who, as noted by the ALJ, "specializes in orthopedic surgery of the spine" (Tr. 30)) in November 2003, Plaintiff was able to arise and ambulate without any difficulty, and had intact motor strength and sensation (Tr. 540). Dr. Koulisis found that Plaintiff had the ability to lift, carry, sit or walk, and could "continuously" perform postural activities and physical functions (Tr. 543-46). This was similar to the consultative examination with Dr. Lucey in November 1999, in which Plaintiff had a full range of motion in all joints, a normal gait, and only a mildly decreased range of motion in the spine (Tr. 355). Although the opinions of consulting physicians are not entitled to controlling weight, they must be considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence, 20 C.F.R. § 416.927, and the ALJ should consider objective evidence, or the lack thereof, when determining an individual's credibility. *See* 20 C.F.R. § 416.929(c) (2003).

Applying the standards set forth in section 416.927, the ALJ concluded that the opinions of consulting physician Dr. Reyes, regarding Plaintiff's more limited ability to do work-related physical activities, was inconsistent with the record as a whole and with Plaintiff's history of medical treatment. Thus, the ALJ found his opinion to be less than fully credible, assigned it little weight, and otherwise found it non-persuasive. The ALJ did not err in doing so. Dr. Reyes' opinion was inconsistent with the opinion of Dr. Brannon, a treating physician, and was inconsistent with the office notes of Dr. Pacheco, another treating physician. The ALJ properly stated that the notes from Dr. Pacheco showed that Plaintiff was, for the most part, stable with medications (Tr. 398-410, 500-38). Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984). Dr. Reyes' opinion was also wholly inconsistent with the opinion of Dr. Koulisis, another consulting doctor, who opined that Plaintiff had no limitations (Tr. 543-46), as well as the notes from the examination by Dr. Lucey (Tr. 354-59). It is the ALJ's task to examine the evidence and resolve conflicting reports. Wolfe v.Chater, 86 F.3d 1072, 1079 (11th Cir. 1996); Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam). The ALJ did not err in resolving the conflict in the medical opinion evidence.

Finally, Plaintiff asserts that the ALJ improperly discredited his testimony based upon his limited daily activities (Doc. 7 at 10-11).  At steps 4 and 5 of the evaluation process it is appropriate for the ALJ to consider a plaintiff's daily activities.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  If daily activities are to be considered, however, the ALJ must do so in the context of all of the evidence in the record:

> We have consistently held that in ascertaining whether the [Commissioner's] findings are supported by substantial evidence, we do not consider only those parts of the record that support those findings, but rather must "view the entire record and take account of evidence in the record which detracts from the evidence relied on by the [Commissioner]."

Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).

Although ALJ Michel noted Plaintiff's daily activities (Tr. 31), he did not exclusively rely on this factor.  Even though ordinary daily activities do not disqualify an individual from disability, see Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), it is one factor among many that the ALJ may consider.  See Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996); 20 C.F.R. § 416.929 (2004).  Here, as mandated in Parker, the ALJ properly considered all of the evidence in the record in finding that Plaintiff's symptoms were not totally disabling.

Accordingly, this court concludes that the ALJ properly applied the Eleventh Circuit pain standard and that his conclusions are supported by substantial evidence in the record.  Thus, the ALJ did not err.

C.   Development of the Record and Appeals Council's Instructions.

The ALJ has a duty to fully and fairly develop the record.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988); Cowart v. Schweiker, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  See 42 U.S.C. § 406; Cowart, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  See Cowart, 662 F.2d at 735-36.

Plaintiff contends the ALJ failed to fully develop the record as required by the remand instructions of the Appeals Council.[9]  Those instructions required ALJ Michel to do five things (*see* Tr. 130-31); three were mandatory, but two were to be done only "as appropriate and if available"or "if warranted" (Tr. 130).  Plaintiff specifically contends that ALJ Michel failed to follow the fourth instruction, which states "[a]s appropriate and if available, obtain evidence from a medical expert(s) to clarify the nature and severity of the claimant's impairments and the resultant, work-related functional limitations (20 C.F.R. 416.927(f)) and Social Security Ruling 96-6p)" (Doc. 7 at 13; Tr. 130).

Plaintiff's argument suggests that the ALJ was absolutely required to contact physicians and/or medical experts (*see* Doc. 7 at 13).  However, the language of the remand instructions clearly suggests otherwise.  The ALJ was only required to do so "as appropriate and if available," and in accordance with certain regulations and rulings.  As provided in 20 C.F.R. § 416.927(f)(2)(iii), "Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any [listed] impairment . . . ." (emphasis added).  Similarly, Social Security Ruling 96-6p provides in pertinent part:

> However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:
> - When no additional medical evidence is received, but *in the opinion of the administrative law judge* or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
> - When additional medical evidence is received that *in the opinion of the administrative law judge* or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments (footnote omitted) (emphasis added).

Here, the ALJ exercised his discretion, as was permissible under both the remand instructions and the applicable law, and concluded that it was not necessary to contact physicians or call medical

---

[9]Initially, only one set of remand instructions are relevant to the instant appeal; namely, those issued on July 3, 2003 (*see* Tr. 129-31), prior to Plaintiff's third hearing before ALJ Michel.  The earlier remand instructions applied only to the hearing and/or decision of ALJ Erwin.

experts.  His conclusion should not be disturbed, as there is no indication that further evidence was outstanding from any treating physician.  Updated reports from Dr. Pacheco were obtained (Tr. 500-38) and Plaintiff was seen by another consulting doctor, Dr. Koulisis, following the remand order (Tr. 539-46).  This Court fails to see what further development would be necessary, nor does Plaintiff suggest in any detail what evidence is outstanding.  Here, as in Graham, 129 F.3d at 1423, the record as a whole is "neither incomplete nor inadequate" and does not "show the kind of gaps in the evidence necessary to demonstrate prejudice."  Thus it was not necessary for the ALJ to further develop the record and, accordingly, the ALJ did not err.

      D.     Availability of Other Work Plaintiff can Perform.

      A VE testified at Plaintiff's hearing before ALJ Michel, after listening to Plaintiff's testimony.  In response to a hypothetical question posed by the ALJ that included Plaintiff's age, education, limited ability to read and write, and prior work as a taxi driver, the VE indicated that Plaintiff's work as a taxi driver was semi-skilled, medium exertion, with no transferable skills (Tr. 574-75).  After a review of Exhibits 12F and 13F (see Tr. 412-30, the consultative examination reports of Doctors Reyes and Doll), the VE opined that Plaintiff would be unable to return to his prior work as a taxi driver (Tr. 575-76).  However, the VE testified that Plaintiff could perform limited work in the light, sedentary category, such as parking or arcade attendant, or surveillance monitor, and that such jobs were available in the national, regional and/or local economies (Tr. 576-78).  Finally, the VE was asked to additionally consider the limitations set forth in Exhibit 5F (see Tr. 360-63, the consultative examination report of Dr. Thomas).  Per the VE, his answer would be the same (i.e., other, limited work could be performed) (Tr. 577).  Following the ALJ's questioning, Plaintiff's attorney asked the VE if Plaintiff would be precluded from the surveillance monitoring job if the VE were to consider Plaintiff' I.Q. level (64) and its impact on his ability to understand, remember, and carry out detailed instructions (Tr. 579).  In response, the VE stated, "There may be a few positions listed as really an unskilled job, at the sedentary [surveillance system monitor], or light unskilled jobs [parking attendant, arcade attendant], is really kind of the positions that I've given.  So the unskilled positions should generally fit within those parameters of the -- excluding the more complex tasks." (id.).  Plaintiff's attorney also asked the VE that, if a surveillance system monitoring position required a person to sit more than four hours, would Plaintiff be precluded from

performing such a job.  The ALJ responded that it would be "borderline" or "marginal," although the VE opined that such jobs usually allow for the flexibility of standing or sitting (Tr. 580).

Plaintiff asserts that the hypothetical questions posed by the ALJ failed to comprehensively describe Plaintiff's impairments, and that the ALJ improperly disregarded the VE's answer to the question posed by Plaintiff's attorney.

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  Here, the ALJ's hypothetical question accurately and comprehensively described Plaintiff's condition.  The ALJ first determined that the VE was present during the entire hearing and had heard all of the testimony (Tr. 573).  Following that, the ALJ's initial question to the VE included Plaintiff's age, education (the question assumed Plaintiff had only completed 6th grade, when, in actuality, Plaintiff had completed the 7th grade), and limited ability to read and write.  Subsequent questions included a consideration of the reports of Dr. Reyes, Doll and Thomas, which included both mental and physical capacity assessments.  Notably, the report of Dr. Reyes provides the most restrictive physical limitations of any report in the record, and despite these restrictions, the VE maintained that Plaintiff was capable of some, specified work.  Plaintiff suggests that because Dr. Reyes limited Plaintiff to four hours of sitting in a day, and a surveillance monitor might need to sit longer than that, the VE's answer is flawed.  However, the VE testified that normally a surveillance monitor is allowed the flexibility of sitting or standing as needed; and furthermore, as noted above, the restrictive limitations set forth by Dr. Reyes were properly rejected by the ALJ.  Similarly, even after considering the report of Dr. Doll, which contained Plaintiff's I.Q. levels, the VE found that Plaintiff was capable of performing limited work.  If the VE was somehow mistaken in his answer, this court's conclusion remains the same because, like the restrictive limitations of Dr. Reyes, the I.Q. scores were inconsistent with the record as a whole and were properly discredited by the ALJ.

Moreover, in a case of solely exertional impairments, as in this case, the Commissioner may rely on the medical vocational guidelines (the "grids") to meet her burden of proving the availability of jobs in the national economy a claimant can perform.  See 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00.  The grids reflect an analysis of various vocational factors such as age, education, and work

experience, in combination with residual functional capacity, in evaluating an individual's ability to engage in substantial gainful activity other than his past relevant work.  *Id.*  The grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id.*  Bolstering the testimony of the VE, and as noted by the ALJ (Tr. 33), application of the medical vocational guidelines in this case directs a finding that Plaintiff is not disabled.  Exclusive reliance on the grids is appropriate when the claimant is capable of performing a full range of work at a given residual functional level or when a claimant does not have non-exertional impairments that significantly limit basic work skills.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004).  Accordingly, this court concludes that the Commissioner carried her burden of establishing the availability of other work in the national economy that Plaintiff can perform.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 18th day of August, 2005.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten (10) days after being served a copy hereof.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**